UNITED STATES, Appellee

v

GEORGE D. McGLENN, Private First Class,
U. S. Marine Corps, Appellant

8 USCMA 286, 24 CMR 96

No. 9584

Decided October 4, 1957

 

*Commander Charles Timblin,* USN, argued the cause for Appellant, Accused.

*Major Verne L. Oliver,* USMC, argued the cause for Appellee, United States. With him on the brief was *Commander Guilbert W. Martin,* USN.

## Opinion of the Court

HOMER FERGUSON, Judge:

The accused stands convicted of the offenses of wrongfully possessing and using marihuana. He seeks reversal of the conviction of wrongful possession based on a claim of illegal entrapment by Government agents. We granted review, limited to the following issues:

1. Whether the evidence of inducement of the accused by a Government agent to purchase marihuana cigarettes for the agent required the prosecution to rebut this by proof of excuse for such inducement.

2. Assuming an affirmative answer to the first issue, did the prosecution sustain such burden?

3. Whether the law officer was required to instruct that where entrapment is raised the burden was on the defense to show inducement by the Government, but that once this was

shown the burden was then on the prosecution to show excuse for such inducement.

The conviction of wrongful possession must be reversed because of the Government's failure to rebut evidence of inducement on the part of its agents by showing that reasonable grounds existed for the belief or suspicion that the accused was engaged in narcotics traffic. Therefore, it is unnecessary to decide or discuss the third issue raised.

The facts essential to the present decision are as follows: On the evening of December 16, 1955, the accused, together with other Marines, was engaged in a barracks dice game. Present, but not participating in this group activity, was one Robert Dooley, a narcotics addict turned Criminal Investigation Division informer.[1] Dooley was then in-

---

[1] Further illustrations of "Agent Dooley's *modus operandi*" may be gleaned from our recent decision in United States v Ciarletta and Martin, 7 USCMA 606, 23 CMR 70. There, the accused, as in the instant case, were convicted of narcotics offenses. The Court in its decision noted that both "Ciarletta and Dooley smoked some of the drug that evening, and Martin shared their experience the following day." The offenses allegedly committed in the case at bar occurred less than two weeks after those committed by Ciarletta and Martin. Dooley testifying by deposition in the present case—following his administrative discharge from the service—was asked several

troduced for the first time to the accused through a mutual friend. A short while later the informer offered the accused $5.00 for the purpose of purchasing some marihuana cigarettes for him. The accused refused the offer and returned to the game. Dooley, however, continued to importune the accused, until the latter relented and consented to make the purchase. The game proved popular and as a result lasted longer than expected. Due to the lateness of the hour, the accused decided not to go into town and returned the money to the informer. The next morning Dooley again appeared in the accused's barracks and again implored him to make the purchase. The accused again refused, but finally consented and accepted the money. The purchase of twelve marihuana cigarettes was made that evening and the accused returned to his barracks and found Dooley asleep on his (accused's) bunk. After awakening him, they went to the accused's car where the contraband was exchanged. Pursuant to Dooley's request, the accused retained six of the cigarettes for safekeeping.

The following morning Criminal Investigation Division Agent Harris, after receiving a call at his home from the informer, proceeded to the accused's barracks, where he found him in possession of six marihuana cigarettes. A subsequent search of the accused's car revealed a "roach"[2] in the glove compartment. A statement was later obtained from the accused in which he admitted having purchased the cigarettes from a "pusher" in Los Angeles. He also admitted smoking two or three of the cigarettes with a friend prior to returning to the base.

Agent Harris, the sole prosecution witness at trial, testified generally concerning the events leading up to the accused's apprehension. He testified that on the morning of the arrest, he had received information from the informer concerning the accused's possession of the cigarettes. The prosecution rested after the introduction of the accused's statement into evidence. The defense opened its case by informing the court that it intended "to present a defense to this offense, namely entrapment." Agent Harris was recalled as a defense witness and testified that Dooley had been confined in the base brig because of narcotics violations.[3] Pursuant to the provost marshal's request, he had been released in order that he might "act in the capacity as a narcotic's informant" for both the Los Angeles Police Department and the Criminal Investigation Division. The agent further testified that he had instructed Dooley not to purchase any marihuana because the Division had no money to reimburse him for such expenditures.

The accused took the stand in his own defense limiting his testimony to the wrongful possession charge. He admitted having purchased the cigarettes, but only after Dooley's incessant persistence. After being apprehended he did not disclose to the investigators that the cigarettes belonged to Dooley because of his claimed desire not to implicate the latter.

Lieutenant Colonel Menconi, Base Provost Marshal, was next called as a defense witness. He testified concerning the employment of Dooley as an informer in exchange for which he had promised to write to the informer's commanding officer "setting forth his degree of cooperation and it would be up to his commanding officer whether or not he wanted to take this into cognizance and reduce his sentence or get him out of a court-martial completely." The witness denied having initiated any instructions to the informer as to how the purchase was to be made. Defense counsel then directed the following questions to the witness, which are particularly pertinent to the issues we now consider:

"Q. Colonel you say an informant is a person who make [sic] contact

---

times whether he had ever used marihuana during 1955 and 1956. He answered each time in the negative.

[2] A marihuana cigarette stub in narcotics' vernacular.

[3] Ironically enough, Dooley himself had been arrested after having been "fingered by an informant."

with a person suspected of an offense. Previous to this, was George McGlenn suspected of an offense?

"A. *I can't answer that, I don't know.*

"Q. Did you suspect him?

"A. *Did I personally, no.*" [Emphasis supplied.]

In addition to this specific disclaimer by the Base Provost Marshal himself, the entire record is silent as to any evidence indicating that reasonable grounds existed to believe that the accused was trafficking in narcotics. No previous connection with the traffic nor any complaints made with reference to him were established. Once the defense had introduced evidence showing inducement of the accused by one acting as a Government agent, the prosecution was then required to show that excuse—reasonable grounds or suspicion to believe that the accused was dealing in narcotics—existed to justify the inducement. This the Government failed to do and this failure requires reversal. Pertinent Federal authorities are in accord with the position we take. In the leading case of C. M. Spring Drug Co. v United States, 12 F2d 852 (CA8th Cir) (1926), involving a violation of the Federal narcotics law, the Court said:

". . . It is well settled by the decisions of the Supreme Court of the United States, we think now universally followed in the several circuits, that, where the government, through its agents, *has reasonable cause to believe that the law is being violated by the defendant,* they may legally entrap the defendant by decoy letters or by pretended purchases. Price v United States, 165 US 311, 17 S Ct 366, 41 L Ed 727; Grimm v United States, 156 US 604, 15 S Ct 470, 39 L Ed 550; Goode v United States, 159 US 663, 16 S Ct 136, 40 L Ed 297; Andrews v United States, 162 US 420, 16 S Ct 798, 40 L Ed 1023; Fiunkin v United States (CCA) 265 F 1." [Emphasis supplied.]

In United States v Mitchell, 143 F2d 953 (CA 10th Cir) (1944), the accused was charged with a narcotics violation. He contended that he was illegally entrapped because he had made sales based on decoy letters written by Government agents. The court, in holding that the accused was legally entrapped, said:

"The agent Westover testified that he had been investigating appellant for eight or nine months; that he had narcotics purchased from appellant; that he took an informer to Shidler, Oklahoma, where he saw him go to appellant and later return; that this was repeated three or four times; that he became acquainted with Earl Allen and Charles Gholston, who were both addicts; that it was after a conference with Gholston that he prepared the decoy letter. *We think this amply sustains the government's contention that the government through its agents had reasonable cause to believe that appellant was violating the law.*" [Emphasis supplied.]

Another leading case illustrative of the principle here announced is Heath v United States, 169 F2d 1007 (CA10th Cir) (1948). The accused there was charged with carrying on a wholesale liquor business without paying a special tax as required by statute. A Government agent testified concerning transactions he had conducted with the accused. The accused injected the defense of entrapment into the case thereby placing upon the Government the burden of justifying the entrapment. Evidence was then admitted relating to the investigator's receipt of numerous reports as well as his previous knowledge of the defendant's unlawful liquor activities. The court, after declaring that such evidence was properly admitted for the purpose of justifying the entrapment of the accused, and was competent testimony, said:

". . . It is well recognized that officers may entrap one into the commission of an offense *only when they have reasonable grounds to believe that he is engaged in unlawful activities.* They may not initiate the intent and purpose of the violation. In a case of entrapment, it is incumbent on the government to prove reasonable grounds to believe that the intent and purpose to violate the law existed in the mind of the accused." [Emphasis

supplied.] [Accord, Ryles v United States, 183 F2d 944 (CA 10th Cir) (1950); Nero v United States, 189 F 2d 515 (CA 6th Cir) (1951).]

In Weathers v United States, 126 F2d 118 (CA 5th Cir) (1942), the accused was charged with depositing in the mail certain letters intending to give information concerning the production of an abortion. The letters set forth in the indictment were in answer to a decoy letter sent out by a post office inspector. On appeal the accused contended that he was unlawfully entrapped and that the reply letters ought to have been excluded and an acquittal directed. In rejecting this contention, the court said:

". . . It is well settled that when a person is reliably reported to be violating a law, or when the circumstances show it is likely, he may by an officer be tested by an opportunity, a decoy. Price v United States, 165 US 311, 17 S Ct 366, 41 L Ed 727; Andrews v United States, 162 US 420, 16 S Ct 798, 40 L Ed 1023; Rosen v United States, 161 US 29, 16 S Ct 434, 40 L Ed 606. But an officer ought not to lure a man who is not criminal-minded into committing a crime for the sake of punishing somebody. The courts will not, as a matter of good policy, sanction a conviction where a person not justly an object of suspicion is through undue temptation or pressure by an officer induced to become a criminal. Sorrells v United States, 287 US 435, 53 S Ct 210, 77 L Ed 413, 86 ALR 249. In this case Weathers, a physician, was known for a long time to have been advertizing under another name a 'maternity home', which was really his own home, where he treated patients and had a few beds for their use. The advertisements were published in several newspapers in three States, and many of the newspapers were of course carried in the mails. The advertisements invited correspondence addressed to a postoffice box of a friend of Weathers. The postoffice inspector was informed that abortions were in fact being performed. Knowing that the advertisements were being carried in the mails, he concluded that they really were intended for patients who were seeking abortions. He wrote the decoy letter purporting to be from a single girl in another State, pregnant for six weeks, asking for a solution to her trouble, and saying she had some money but must leave her city. The accused, under the name assumed in advertising, answered, telling her to come to Jacksonville, to a stated address (being the home of Dr. Weathers), and call for Dr. Weathers, and she could probably return home in a week or ten days. It was left to the jury to say whether under these circumstances there was an unlawful temptation offered by an officer. We find no error." [Accord, Morei v United States, 127 F2d 827 (CA 6th Cir) (1942) where the accused's conviction for a narcotics violation was reversed because of illegal entrapment where there "was no evidence that he had ever been engaged in the narcotic traffic or any other criminal transactions; and there was no reasonable cause to believe that he was engaged in the narcotic traffic."] [Emphasis supplied.]

By no means are we to be understood as saying that lack of probable cause to believe that accused was dealing in narcotics or lack of suspicion in the mind of an agent or informer who makes a pretended purchase, alone constitutes entrapment. Swallum v United States, 39 F2d 390 (CA8th Cir) (1930). All we hold is that when a showing of inducement by a Government agent is made, the prosecution must prove that its agents acted under a reasonable belief that the law was being violated by the accused. The gist of the defense of illegal entrapment is that an agent conceives an offense against the law and then incites a person to commit that offense for the purpose of prosecution. In United States v Certain Quantities of Intoxicating Liquors, 290 Fed 824 (D NH) (1923), the court, after carefully examining authorities, set forth the rule that in order to defeat a claim of an illegal entrapment, one of the following conditions must be met:

". . . (1) reasonable suspicion on the part of the officers that the

291

party is engaged in the commission of a crime or is about to do so; or (2) the original suggestion or initiative must have come from the perpetrator."

We adopt this rule and when we apply it to the instant case, we are satisfied that the Government has failed to establish either condition. As we have previously noted, the Government failed to show that a reasonable suspicion or belief existed that the accused was engaged in the traffic. As to the second condition the record shows beyond cavil that the "original suggestion or initiative" originated not with the accused, but with the informer acting in concert with Government agents.

The Government in its brief cites the case of United States v Ginsburg, 96 F2d 882 (CA 7th Cir) ■ (1938) as authority for the proposition that Government agents need not have reasonable grounds to·believe that an accused is engaged in unlawful activities in order to use informers to procure the commission of an·offense. We believe reliance on the Ginsburg case, supra, is misplaced because there the accused "made no defense of entrapment in the District Court, tendered no instructions on that question, and made no objections that none were given upon that subject. His sole defense was that he did not sell the drug, and at no time had it in his possession, or aided in concealing it. Under these circumstances the contention [illegal entrapment] is not tenable." It is well settled that the defense of entrapment is not available to one who denies commission of the offense. Nutter v United States, 289 Fed 484 (CA 4th Cir) (1923).

When the issue of illegal entrapment is interposed as a defense, the predisposition for criminal ■ design of an accused becomes relevant, and it is incumbent upon the prosecution to show what grounds of suspicion existed to warrant the inducement. United States v Siegel, 16 F2d 134 (D Minn) (1926). Law enforcement officers are entitled to act in such cases upon information which warrants such a reasonable be-

lief. St. Clair v United States, 17 F2d 886 (CA 8th Cir) (1927). Statements made by the accused relative to previous similar ■ acts upon his part have been held admissible to show that the officers were attempting to detect crime and not to induce its commission. Fisk v United States, 279 Fed 12 (CA 6th Cir) (1922). Likewise evidence of the accused's prior convictions for narcotics offenses is also relevant as tending to refute the contention that the intent to bring about the crime originated with the officers. Carlton v United States, 198 F2d 795 (CA 9th Cir) (1952). Furthermore, in order to meet the issue of entrapment, the prosecution may properly interrogate witnesses as to whether at approximately the time of the alleged offense, for which an accused is being tried, he engaged in other similar acts, such testimony being relevant in order to show that the accused was not a victim of zealous officers. Sauvain v United States, 31 F2d 732 (CA8th Cir) (1929).

We are unimpressed by the fact that the accused admitted in a pretrial statement that he had previously made "at least two buys in Los Angeles." Such evidence is an insufficient substitute for a showing that Government agents had reasonable grounds to suspect the accused prior to the instant offense. We have no intention of derogating in the least from our previous holding that law enforcement officials may smooth the path of one intent upon the commission of a crime and afford him "ample opportunity to rush to his own destruction." United States v Buck, 3 USCMA 341, 12 CMR 97. Neither do we wish to retreat from the well-recognized principle that Government agents may properly use decoys, set traps, "or engage in other stratagems and forms of trickery" in order to apprehend law violators. United States v Hawkins, 6 USCMA 135, 19 CMR 261. This case, however, presents a woeful tale of a miserable addict turned informer, who was permitted, without proper guid-

ance or instruction by Government agents, to indiscriminately solicit and induce fellow Marines to commit serious criminal offenses. In exchange for rendering these "professional services" he was able to obtain separation from the service without being court-martialled for his own narcotics offenses. To permit the Government to enter upon such a disgraceful "fishing expedition" with such poor bait is too well calculated to bring military law enforcement into contempt and disrepute. We are not prepared to sanction principles which must lead to such results. The decision of the board of review is reversed. The findings of guilt as to the offense of wrongful possession of marihuana is set aside and the same is ordered dismissed. The record of trial is returned to The Judge Advocate General of the Navy for reference to a board of review for reassessment of sentence as to the remaining approved findings of guilt.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

I believe it advisable to first call attention to the fact that the accused defended on the grounds of entrapment. I doubt there was an issue reasonably raised, but if I am wrong in that conclusion, it matters little, for the defense was submitted to the court-martial under instructions favorable to the accused. Therefore, in considering the error asserted, we need go no further than to ascertain whether there is sufficient evidence to sustain the finding that the accused was not entrapped. However, I suppose my associates conclude that the facts show entrapment as a matter of law and that the law officer erred in his submission of the issue.

I believe it further advisable to point out that in this case the accused was charged with both use and possession of marihuana arising out of the same continuous transaction. He was convicted on both offenses. The use did not involve a cigarette intended for delivery to the informer, and it is a fair inference that the finding of possession was not predicated solely on the cigar-

ettes purchased for him. It is possible, but it seems a bit strange, that the accused would be entrapped into possessing cigarettes which he himself used, and he confessed to smoking two or three. But, be that as it may, I contend that there is no evidence to show entrapment. Moreover, if it is material to a decision in this case, I believe the record is sufficient to show that prior to this offense, Dooley, the undercover agent, had reasonable grounds to believe that the accused was trafficking in habit-forming drugs.

As I marshal the facts in the record, I find very little evidence to support some of the forceful condemnations of Dooley found in the Court's opinion. While I do not champion the use of informers to detect crimes, we have not frowned on their use. See United States v Hawkins, 6 USCMA 135, 19 CMR 261, and United States v Gibson, 3 USCMA 746, 14 CMR 164. The underworld characters peddling dope pose a critical problem in both military and civilian communities. Experience has proven, and this record supports the conclusion, that unless those who have been or are habitues of the trade can be employed as undercover agents, the possibility of defeating those who profit from the racket is indeed slim. And, it is very interesting to note that the record in this case discloses that this informer was the vehicle for closing at least two civilian outlets in Los Angeles. While I realize that this is all beside the point to the issue before us, the Court seems to be indignant about the military service giving consideration to informers, and I would not want to support that condemnation without more facts upon which to base my judgment.

Now to the facts which control this decision. The accused took the stand in his own behalf and very carefully elected to confine his testimony to the possession specification. According to his evidence, as it is supplemented by the deposition of Dooley, the two became acquainted on the night of December 16, 1955. Dooley averred that he was introduced to the accused by "Slick" Berrian for the purpose of having the accused buy marihuana. The accused

concedes his familiarity with Berrian and does not dispute that he was the intermediary or that the reason for the introduction was as indicated. In his pretrial statement, the accused admits that he is a user of marihuana; that he had smoked marihuana cigarettes for a period of three months prior to this incident; and that he had purchased marihuana in Los Angeles, California, on at least two different occasions prior to the purchase for Dooley. He is hardly the innocent youth who was lured by a "miserable addict" to become an offender. On the contrary, he was a member of a group who had no compunctions about trafficking in dope.

When accused was introduced to Dooley, the friendship must have jelled rapidly, for the latter was holding the accused's money while he was participating in throwing the dice. During the course of the evening, Dooley—who must have had a sixth sense unless he knew the accused's propensities—gave the accused a five dollar bill and asked him to purchase some marihuana. The source of supply was in Los Angeles, some forty-five miles away, and, of course, this was known to the accused, for he had made prior purchases and he did not suggest ignorance of any vendor. The request was refused by the accused for the very illuminating reason that it was inconvenient for him at the time and the money was later returned to Dooley. On the following day, Dooley was on the bunk of the accused when he returned to his barracks. It matters little who opened up the conversation, but during its course the accused informed Dooley that he was going on liberty, although not immediately. Dooley thereupon offered the accused $5.00 and again requested that marihuana be purchased for him. This request was refused at that time as the accused stated he didn't know whether he would drive to Los Angeles. Sometime thereafter, the accused took the initiative and informed Dooley that he was going to the city, and Dooley furnished him with a five dollar bill with which to purchase the marihuana. The accused proceeded to Los Angeles, purchased twelve cigarettes and, according to his pretrial statement, he and one

**294**

Private Toran smoked two or three of them before returning to the base. When he returned, the cigarettes were distributed, but the parties disagree as to their distribution. Dooley claims he received only three; accused claims all twelve were offered to Dooley, but that after some discussion about the accused being better able to safeguard the contraband, he consented to keep six of the cigarettes. The next day he was apprehended by agents of the Criminal Investigation Division.

In the light of that testimony, it seems to me that much of what is said in the Court's opinion is irrelevant to our problem. I doubt that we need concern ourselves with shifting the burden of proof to the Government to excuse its agents. It just does not sound logical to me to say that a person is innocent of an offense if he is inveigled into committing a crime by an agent who does not know his reputation but, if he is reputed to be a violator under the same facts, he is guilty. To me, he is either entrapped or he is not. If there has been some sort of an inducement, the question is whether it amounts to entrapment. In those jurisdictions where justification is required, the evidence usually takes the form of showing some notoriety of previous transgressions by the accused. Merely because a person has previously erred does not give the Government carte blanche authority to originate the criminal design, implant it in the mind of the accused, and induce its commission. It appears to me the views expressed by Mr. Justice Roberts in Sorrells v United States, 287 US 435, 53 S Ct 210, 77 L ed 413, effectively answer the reasons advanced by the Court. He there said:

"Whatever may be the demerits of the defendant or his previous infractions of law these will not justify the instigation and creation of a new crime, as a means to reach him and punish him for his past misdemeanors. He has committed the crime in question, but, by supposition, only because of instigation and inducement by a government officer. To say that such conduct by an official of government is condoned and

rendered innocuous by the fact that the defendant had a bad reputation or had previously transgressed is wholly to disregard the reason for refusing the processes of the court to consummate an abhorrent transaction. It is to discard the basis of the doctrine and in effect to weigh the equities as between the government and the defendant when there are in truth no equities belonging to· the latter, and when the rule of action cannot rest on any estimate of the good which may come of the conviction of the offender by· foul means.. The accepted procedure, in effect, pivots conviction in such cases, not on the commission of the crime charged, but on the prior reputation or some former act or acts of the defendant not mentioned in the indictment."

It would be unrealistic to conclude that a person who had a reputation for dealing in dope might not be in the business, for that sort of reputation is usually earned. So, too, it would be naive to believe that a Government agent could have reasonable grounds to believe a person was engaged in the habit-forming drug traffic without the belief being supported by· some base. But neither the bad reputation of the accused nor the reasonable belief of an agent ought to permit the Government to entrap alleged offenders. Those are matters which merely cast light on the essential ingredients of entrapment. For that and other reasons,·I see only two important questions in. this case, and they are: First, did the design originate in the mind of Dooley? Second, did he by persuasion lure an innocent and law-abiding Marine into the commission of the crime? If these are answered in the affirmative, the findings should be reversed. If they are answered in the negative, an affirmance is in order.

It will be noted that my two questions find their root in the rule adopted by the Federal civilian courts. I use the language found in Newman v United States, 299 Fed 128 (CA4th Cir) (1924) for it has been cited with approval by the United States Supreme Court in Sorrells v United States, supra.

In the Newman case, Judge Woods stated:

". . . It is well settled that decoys may be used to entrap criminals, and to present opportunity to one intending or willing to commit crime. But decoys are not permissible to ensnare the innocent and law-abiding into the commission of crime. When the criminal design originates, not with the accused, but is conceived in the mind of the·government officers, and the accused is by persuasion, deceitful ·representation, or inducement lured into the commission of a criminal act, the government is estopped by sound public policy from prosecution therefor. 'The first duties of the officers of the law are to prevent, not to punish, crime. It is not their duty to incite to and create crime for the sole purpose of prosecuting and punishing it.' Butts v. United States (C. C. A.) 273 Fed. 35, 18 A.L.R. 143; Goode v. United States, 159 U.S. 663, 16 Sup. Ct. 136, 40 L. Ed. 297; Grimm v United States,· 156 U.S. 604, 15 Sup. Ct. 470, ·39 L. Ed. 550; Fiunkin v United States (C. C. A.) 265 Fed. 1; Smith v. United States (C. C. A.) 284 Fed. 673; Rothman v. United States (C. C. A.) 270 Fed. 31; Woo Wai v. United States, 223 Fed. 412,·137 C. C. A. 604; Zucker v. United States (C. C. A.) 288 Fed. 12; United States v. Reisenweber (C. C. A.) 288 Fed. 520; United States v. Healy (D.C.) 202 Fed. 349; United States v. Lynch (D. C.) 256 Fed. 983."

In that instance, as in many others, the error raised on appeal was that the trial court erred in refusing to submit the defense to or properly instruct the jury on the issue. It is of particular importance to note that, in this instance, the law officer submitted the· defense to the court-martial under instructions favorable to the accused. That formidable step in the procedure is unmentioned by the Court, but it cannot properly be overlooked. As I have mentioned previously and as I hope to establish later, the evidence cannot be interpreted in such a manner as to compel a finding that the accused was entrapped. While my associates take a contrary view, I

am convinced they overlook some of the facts which are of moment to a proper solution of the question.

The characters in this tragedy were all stationed at the Marine Base in El Toro, California. The accused was a user of marihuana, and he was closely associated with others who were also offenders. The source of the supply was in Los Angeles, and its precise location was not generally known. The accused was one of those individuals unfortunate enough to know the modus operandi and the address of the dope peddler. He was introduced to Dooley by one of his friends, who apparently represented to Dooley that the accused would purchase dope for him. While engaged in a game of dice, the accused, when importuned to violate the law, merely stated it was inconvenient for him to leave. Shortly thereafter, he accepts $5.00 as the purchase price of marihuana cigarettes from the man who is his second in a game of dice—a strange pattern of behavior for an innocent and law-abiding member of the Armed Forces who is being unwillingly lured into the commission of an heinous offense. The money was returned that evening, but the reason was that accused did not find it suitable to leave the game and drive the forty-five miles into Los Angeles to make the purchase. On the following day, the accused was hardly an unwilling victim, for he informed Dooley he was going on liberty, and when he was again requested to obtain the drug, he accepted the money and carried out the mission. From that point on, his stories are full of rather glaring inconsistencies, but, as they are pieced together and shaped by the other testimony, I believe any reasonable person would find that he purchased twelve cigarettes, and they were disposed of in the following manner: He and Toran smoked three before arriving at the base, including the "roach" found in his car. He delivered three to Dooley for the $5.00, and he retained six. These were found in his possession the following morning. Of course, at the time of trial, he claimed he was holding the six for Dooley, but, strangely enough, when he first related his story to the investigators, no attempt was

made to fasten the blame on the informer. That became the avenue of attempted escape later, and it goes without saying the court-martial was not required to believe his story.

While I believe the foregoing facts show only that Dooley afforded the accused an opportunity to offend, I can for the moment assume, arguendo, that two or three requests by him, plus the advance of $5.00, equal entrapment, but, as my computations above show, the possession of nine cigarettes is in dispute. There is no evidence that Dooley and the accused had any understanding of the number of cigarettes to be purchased. Dooley states that only three were delivered to him, and he turned them over to the Criminal Investigation Division. He makes no suggestion that he expected delivery of more. The accused takes issue with the informer's statements and accounts for his disposition in an entirely different manner. However, his own stories are inconsistent and his reasons for retaining possession of the six cigarettes extremely tenuous. But, at best for him, that only poses a factual question as to whether those cigarettes were purchased for himself, for other parties, or for the informer, and any dispute in that regard was submitted to the court-martial members for consideration. In my judgment, they could disregard the last explanation offered by the accused and find that nine of the twelve cigarettes were solely and completely owned and possessed by him. Under that sort of finding, I pause to wonder how the doctrine of entrapment can be applied.

One other concept which seems to be implicit in the Court's opinion is that if an informer suggests a purchase, entrapment necessarily follows if the purchase is completed. In most of the cases cited in the Court's opinion, the principle of entrapment was discussed, but there was a verdict of guilt which was affirmed. That alone ought to convince my associates that importuning one to purchase contraband and furnishing the money does not equal entrapment. United States v Perkins, 190 F2d 49 (CA7th Cir) (1951). Furthermore, writing a decoy letter asking one to perform illegal services which initiates

a series of events does not prove that defense. Weathers v United States, 126 F2d 118 (CA5th Cir) (1942). Merely creating an opportunity by being the first to move does not vitiate the subsequent events for if it did, the cases cited by the majority would have had different endings. There is nothing in any of those decisions which holds that an agent of the Government cannot start a chain of circumstances by making the first move. A peddler of dope does not walk up and ask unknown third persons to purchase his illicit merchandise, and a crime of possession does not originate in the mind of the third party merely because he solicits a purchase. All he does by making a request is to offer the accused an opportunity to offend against the law if he is willing to do so.

I find few cases reversed on the doctrine of entrapment, and how different this factual situation is from the one presented in the case which the Supreme Court reversed (Sorrells v United States, supra). For the benefit of the reader, I set out the factual base for the holding in that case that the defense should have been submitted to the jury for determination. There the informer, accompanied by three well-known friends of the defendant's, went to the latter's home, where the agent was introduced as a friend of the neighbor's and a furniture dealer from another town. The agent was a former member of the 30th Division, AEF, as was the defendant, and one of the neighbors. The length of the visit was about an hour to an hour and a half, and much of the conversation turned to the war experiences of the three. A camaraderie was developed, and the agent asked several times if the defendant could obtain some whiskey for him. At first the defendant replied he did not fool with whiskey, but when the agent finally pleaded that he would like to get a half gallon of whiskey to take back home to a friend, and asked the defendant to assist, the latter capitulated and stated he would go and see if he could obtain the liquor. He was gone between twenty and thirty minutes before he returned with the whiskey. It was testified that the defendant had a good character and that he had been continuously employed with the same company for six years. To rebut the character testimony, three witnesses testified the defendant had the reputation of being a rum-runner, but there was no evidence of any prior sale or possession of liquor. I can well understand why, in that instance, the Supreme Court said the judge erred in not submitting the issue of entrapment to the jury—not that he erred in not holding, as a matter of law, that the defense was established—but in this instance I cannot understand why, on a charge of possession of marihuana, my associates say that all reasonable persons would be compelled to find that this accused was an innocent victim of an entrapment. Certainly I am unreasonable enough to be convinced to the contrary.

I would affirm the board of review.